COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-98-118-CV
  
  
HMS 
AVIATION AND                                                             APPELLANT
LAYALE 
ENTERPRISES, S.A.                                              AND 
APPELLEE
 
V.
 
LAYALE 
ENTERPRISES, S.A. AND                                              APPELLEE
HMS 
AVIATION                                                             AND 
APPELLANT
 
  
------------
 
FROM 
THE 67TH DISTRICT COURT OF TARRANT COUNTY
 
------------
 
OPINION
 
------------
        The 
trial court denied the special appearance of HMS Aviation (“HMS”). Both HMS 
and Layale Enterprises, S.A. (“Layale”) appeal from portions of the trial 
court’s ruling on HMS’s special appearance. In this interlocutory appeal, 
HMS appeals the trial court’s ruling that it has in rem jurisdiction over the 
property that is the subject of this suit. Layale appeals the trial court’s 
ruling that it does not have in personam jurisdiction over HMS.[1] 
We hold the trial court did not have in personam or in rem jurisdiction in this 
case. We reverse the trial court’s judgment and render judgment dismissing the 
case.
Background
        Layale 
filed this suit against HMS seeking to recover title and possession to a Boeing 
727 airplane (“the Airplane”)[2] and damages 
alleged to have been sustained by Layale as a result of HMS’s alleged 
conversion of the Airplane. Layale, a Panamanian corporation, claimed that it 
purchased the Airplane in 1987 from the Sultan of Brunei and registered the 
Airplane in the Cayman Islands, British West Indies. Layale contends the 
Airplane disappeared from an airport in Amman, Jordan and that HMS secreted the 
Airplane from Layale from 1992 to 1997 when Layale discovered its whereabouts in 
Fort Worth, Texas.
        HMS 
is a sole proprietorship unincorporated business operating under the laws of 
Jordan with offices in London, England and Amman, Jordan. HMS asserts that in 
February 1996, it took possession of the Airplane in Amman, Jordan pursuant to a 
lease agreement whereby HRH Prince Talal Bin Mohammed and HRH Princess Ghida 
Talal of the Hashemite Kingdom of Jordan leased the Airplane to HMS.
        While 
the Airplane was in HMS’s possession, HMS took the Airplane to a repair and 
refurbishing facility in San Antonio, Texas, and at a later date to a repair 
facility at Meacham Field in Fort Worth, Texas. On April 10, 1997, while the 
Airplane was located at Meacham Field, Layale filed this suit alleging HMS had 
converted the Airplane that belonged to Layale, seeking damages for conversion 
and a declaratory judgment that Layale was the owner of the Airplane and was 
entitled to possession. The trial court granted Layale a writ of sequestration, 
and the Airplane remains in Fort Worth.
        HMS 
filed a special appearance contending that the trial court did not have 
jurisdiction over HMS or the Airplane. The trial court held a hearing on the 
special appearance plea. On April 9, 1998, the court found HMS had not entered a 
general appearance; the court had no personal jurisdiction over HMS; but the 
court had in rem jurisdiction over the Airplane. Accordingly, the court denied 
HMS’s special appearance plea. No findings of fact were requested or filed.
        Both 
parties appealed the trial court’s order, and the case was set for oral 
argument in this court for September 2, 1998. On August 25, 1998, the parties 
notified this court that the case had been removed to federal court. 
Accordingly, on August 28, 1998 this court issued an order removing the case 
from the court’s docket and stating that for administrative purposes this case 
was “abated and will be treated as a closed case.” The order further stated 
that the cause “may be reinstated on prompt motion by any party showing that 
the cause has been remanded to state court and specifying what further action, 
if any, is required from this court.”
        On 
February 17, 2004, HMS filed a motion to reinstate this appeal. At this 
court’s request, on March 8, 2004 HMS filed a copy of the order from the 
United States District Court remanding the case to state court. This federal 
court order is dated February 4, 1999. Prior to February 17, 2004, neither of 
the parties involved in this appeal had previously notified this court that the 
case had been remanded to state court, and this court was unaware of the federal 
court’s action. Further, the parties have not proffered any explanation 
regarding the reason for the five-year delay in notifying this court that the 
federal court had remanded the case to state court.[3]
        On 
March 12, 2004, this court reinstated this appeal and notified the parties that 
because this is a permissible interlocutory appeal from a special appearance, 
this appeal is accelerated. See Tex. 
Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (Vernon Supp. 2004-05); Tex. R. App. P. 28. The case was 
submitted to the court with oral argument on April 6, 2004.
Waiver Of 
Special Appearance
        Layale 
initially asserts that HMS has waived its right to challenge the denial of its 
special appearance plea. This same argument was raised in the trial court, which 
ruled against Layale on this issue by finding that HMS had not entered a general 
appearance. The basis for Layale’s contention is that after HMS filed its 
special appearance, and before the trial court denied the special appearance, 
HMS filed a motion to increase the sequestration bond. The motion was not heard 
or ruled upon until after the trial court denied HMS’s special appearance. 
Layale contends that the filing of HMS’s motion is inconsistent with its 
special appearance and constitutes a general appearance.
        A 
party enters a general appearance whenever it invokes the judgment of the court 
on any question other than the court's jurisdiction; if a defendant's act 
recognizes that an action is properly pending or seeks affirmative action from 
the court, that is a general appearance. Dawson-Austin v. Austin, 968 
S.W.2d 319, 322 (Tex. 1998), cert. denied, 525 U.S. 1067 (1999). However, 
Rule 120a provides a vehicle by which a defendant may file a pleading in 
addition to the special appearance. Tex. 
R. Civ. P. 120a. In pertinent part, this rule provides:
  
1.. 
. . Such special appearance shall be made by sworn motion filed prior to motion 
to transfer venue or any other plea, pleading or motion; provided however, 
that a motion to transfer venue and any other plea, pleading or motion 
may be contained in the same instrument or filed subsequent thereto 
without waiver of such special appearance; and may be amended to cure 
defects. The issuance of process for witnesses, the taking of depositions, the 
serving of requests for admissions, and the use of discovery processes, shall 
not constitute a waiver of such special appearance. Every appearance, prior to 
judgment, not in compliance with this rule is a general appearance.
 
2.Any 
motion to challenge the jurisdiction provided for herein shall be heard and 
determined before a motion to transfer venue or any other plea or pleading may 
be heard.
 
. 
. . .
 
4.. 
. . If the objection to jurisdiction is overruled, the objecting party may 
thereafter appear generally for any purpose. Any such special appearance 
or such general appearance shall not be deemed a waiver of the objection to 
jurisdiction when the objecting party or subject matter is not amenable to 
process issued by the courts of this State.

Id. 
(emphasis added). The words "not amenable to process" in Rule 120a(4) 
mean that the special appearance is available solely to establish that the court 
cannot, under the federal and state constitutions and the appropriate state 
statutes, validly obtain jurisdiction over the person or the property of the 
defendant with regard to the cause of action pled. GFTA Trendanalysen B.G.A. 
Herrdum GMBH & Co., K.G. v. Varme, 991 S.W.2d 785, 786 (Tex. 1999).
        Rule 
120a makes matters in the same instrument and subsequent matters subject to the 
special appearance without an express statement to that effect for each matter. Dawson-Austin, 
968 S.W.2d at 322. The first sentence of HMS’s motion to increase the 
sequestration bond recites that it is “subject to and without waiving its 
previously filed Special Appearance pursuant to Tex. R. Civ. P. 120a.” Nonetheless, 
Layale contends this constitutes a general appearance, citing St. Louis & 
S.F.R. Co. v. Hale, 109 Tex. 251, 206 S.W. 75 (1918). St. Louis was 
decided well before the enactment of Rule 120a in 1962.[4] 
As noted in the General Commentary to Rule 120a, prior to the adoption of Rule 
120a, a special appearance was unknown to Texas practice, and the filing by a 
defendant of any defensive pleading, though only to challenge the court’s 
jurisdiction, constituted an appearance and submission to the jurisdiction of 
the forum. General Commentary—1966, Tex. R. Civ. P. Ann. 120a (Vernon 2003); 
Atchison, T. & S.F. Ry. Co. v. Stevens, 109 Tex. 262, 206 S.W. 921, 
921-22 (1918). Accordingly, because St. Louis was decided at a time when 
Texas did not permit a defendant to challenge the trial court’s jurisdiction 
by filing a special appearance, we do not find it applicable to the instant 
case.
        Layale 
also relies upon Fridl v. Cook, 908 S.W.2d 507, 515 (Tex. App.—El Paso 
1995, writ dism’d w.o.j.). In that case, the defendant claimed the trial court 
erred in refusing to quash discovery requests against the defendant because it 
had never been named as an independent defendant nor had it been served with 
citation. Id. The appellate court held that the defendant waived its 
complaint by making a general appearance in the case when it filed a motion to 
compel arbitration. Id. A Rule 120a special appearance was not involved 
in Fridl; therefore, we do not find it applicable to the situation before 
us.
        HMS’s 
motion seeking to increase the sequestration bond was filed “subject to” its 
pending special appearance, and the hearing and ruling on the special appearance 
took place prior to the hearing and ruling on the motion to increase the 
sequestration bond.[5]  In an analogous 
situation, a defendant’s special appearance was held not to have been waived 
by the subsequent filing of a motion to dissolve a writ of garnishment, or the 
notice of the hearing on the motion, because the motion was not heard prior to 
the ruling on the special appearance. Minucci v. Sogevalor, S.A., 14 
S.W.3d 790, 799-800 (Tex. App.—Houston [1st Dist.] 2000, no pet.); see also 
Exito Electronics Co. v. Trejo, 47 Tex. Sup. Ct. J. 738, 740, 2004 WL 
1434798, at *2 (Tex. June 25, 2004) (holding subsequent special appearance not 
waived by defendant’s prior filing of Rule 11 agreement extending time to file 
an initial responsive pleading, even though Rule 11 agreement was not expressly 
made subject to the special appearance); Dawson-Austin, 968 S.W.2d at 
323-24 (holding that filing of motion for continuance did not waive movant’s 
special appearance because relief requested in motion was not inconsistent with 
assertion that trial court lacked jurisdiction; motion requested trial court 
defer ruling on all matters then pending before the court, including the special 
appearance).
        Because 
HMS’s motion to increase the sequestration bond was made subject to its 
special appearance and the motion was not heard prior to the special appearance 
being heard or determined, we hold the trial court did not err in ruling that 
HMS did not waive its special appearance plea and that HMS had not made a 
general appearance by filing its motion to increase the sequestration bond.[6]
Special 
Appearance
        The 
Due Process Clause of the Fourteenth Amendment limits the power of a state court 
to render a valid personal judgment against a nonresident defendant. World-Wide 
Volkswagen Corp. v. Woodson, 444 U.S. 286, 291, 100 S. Ct. 559, 564 (1980). 
Due process requires that the defendant be given adequate notice of the suit and 
be subject to the personal jurisdiction of the court. Id. The Due Process 
Clause, by ensuring the orderly administration of the laws, “gives a degree of 
predictability to the legal system that allows potential defendants to structure 
their primary conduct with some minimum assurance as to where that conduct will 
and will not render them liable to suit.” Id. at 297, 100 S. Ct. at 
567.
        Whether 
a court has personal jurisdiction over a defendant is a question of law. Am. 
Type Culture Collection, Inc. v. Coleman, 83 S.W.3d 801, 805-06 (Tex. 2002), 
cert. denied, 537 U.S. 1191 (2003); BMC Software Belgium, N.V. v. 
Marchand, 83 S.W.3d 789, 794 (Tex. 2002). But in resolving this question of 
law, a trial court must frequently resolve questions of fact. Coleman, 83 
S.W.3d at 806; BMC, 83 S.W.3d at 794. On appeal, the trial court's 
determination to grant or deny a special appearance is subject to de novo 
review, but appellate courts may be called upon to review the trial court's 
resolution of a factual dispute. Coleman, 83 S.W.3d at 806; BMC, 
83 S.W.3d at 794. When the trial court does not issue findings of fact, 
reviewing courts should presume that the trial court resolved all factual 
disputes in favor of its judgment. Coleman, 83 S.W.3d at 806; BMC, 
83 S.W.3d at 795. However, when the appellate record includes the reporter’s 
and clerk’s records, these implied findings are not conclusive and may be 
challenged on appeal for legal and factual sufficiency. BMC, 83 S.W.3d at 
795.
In Personam 
Jurisdiction
        Layale 
challenges the trial court’s ruling that it did not have in personam 
jurisdiction over HMS. The Texas long-arm statute governs Texas courts’ 
exercise of jurisdiction over nonresident defendants. See Tex. Civ. Prac. & Rem. Code Ann. § 
17.041-.044 (Vernon 1997), § 17.045 (Vernon Supp. 2004-05). That statute 
permits Texas courts to exercise jurisdiction over a non-resident defendant that 
“does business” in Texas, and the statute lists some activities that 
constitute “doing business.” Id. § 17.042. The list of activities, 
however, is not exclusive. BMC, 83 S.W.3d at 795. Section 17.042's broad 
language extends Texas courts’ personal jurisdiction “as far as the federal 
constitutional requirements of due process will permit.” Id. (quoting U-Anchor 
Adver., Inc. v. Burt, 553 S.W.2d 760, 762 (Tex. 1977), cert. denied, 
434 U.S. 1063 (1978)). Thus, the Texas Supreme Court has instructed courts to 
rely upon precedent from the United States Supreme Court and other federal 
courts, as well as our own state’s decisions, in determining whether a 
nonresident defendant has met its burden to negate all bases of jurisdiction. Id.
        Personal 
jurisdiction over nonresident defendants is constitutional when two conditions 
are met: (1) the defendant has established minimum contacts with the forum 
state; and (2) the exercise of jurisdiction comports with traditional notions of 
fair play and substantial justice. Id.; see Int’l Shoe Co. v. 
Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945).
Minimum 
contacts
        The 
purpose of the minimum contacts analysis is to protect the defendant from being 
haled into court when its relationship with Texas is too attenuated to support 
jurisdiction. Coleman, 83 S.W.3d at 806; Schlobohm v. Schapiro, 
784 S.W.2d 355, 357 (Tex. 1990). Thus, the Supreme Court has stated that
 
where 
the defendant “deliberately” has engaged in significant activities within a 
State, or has created “continuing obligations” between himself and residents 
of the forum, he manifestly has availed himself of the privilege of conducting 
business there, and because his activities are shielded by “the benefits and 
protections” of the forum's laws it is presumptively not unreasonable to 
require him to submit to the burdens of litigation in that forum as well.
 
 
Burger 
King Corp. v. Rudzewicz, 471 U.S. 462, 475-76, 105 S. Ct. 2174, 2184 (1985) 
(citations omitted).
        Although 
not determinative, foreseeability is an important consideration in deciding 
whether the nonresident defendant has purposefully established minimum contacts 
with the forum state. BMC, 83 S.W.3d at 795; Guardian Royal Exch. 
Assurance, Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223, 226-27 (Tex. 
1991). However, a defendant should not be subject to a foreign court’s 
jurisdiction based upon random, fortuitous, or attenuated contacts, or the 
unilateral activity of another party. Burger King, 471 U.S. at 475, 105 
S. Ct. at 2183; Guardian, 815 S.W.2d at 226. It is the quality and nature 
of the defendant’s contacts, rather than their number, that is important to 
the minimum contacts analysis. Coleman, 83 S.W.3d at 806; Guardian, 
815 S.W.2d at 230 n.11. Because of the unique and onerous burden placed on a 
party called upon to defend a suit in a foreign legal system, the minimum 
contacts analysis is particularity important when the defendant is from a 
different country. CSR Ltd. v. Link, 925 S.W.2d 591, 595 (Tex. 1996) 
(orig. proceeding) (citing Asahi Metal Indus. Co. v. Superior Court of 
California, 480 U.S. 102, 107 S. Ct. 1026 (1987)).
        The 
Supreme Court has held that the concept of minimum contacts can be seen to 
perform two related, but distinguishable, functions. See World-Wide, 444 
U.S. at 291-92, 100 S. Ct. at 564. It protects the defendant against the burdens 
of litigating in a distant or inconvenient forum, and it acts to ensure that the 
states through their courts do not reach out beyond the limits imposed on them 
by their status as coequal sovereigns in a federal system. Id. at 292, 
100 S. Ct. at 564. The protection against inconvenient litigation is typically 
described in terms of “reasonableness” or “fairness.” Id.
        A 
nonresident defendant’s minimum contacts with a forum can give rise to either 
general jurisdiction or specific jurisdiction. Helicopteros Nacionales de 
Colombia, S.A. v. Hall, 466 U.S. 408, 414 nn.8-9, 104 S. Ct. 1868, 1872 
nn.8-9 (1984); BMC, 83 S.W.3d at 795-96; CSR, 925 S.W.2d at 595. 
Specific jurisdiction is established if the defendant’s alleged liability 
arises from or is related to an activity conducted within the forum. Helicopteros, 
466 U.S. at 414 n.8, 104 S. Ct. at n.8; BMC, 83 S.W.3d at 796. In 
contrast, general jurisdiction is present when a defendant’s contacts in a 
forum are continuous and systematic so that the forum may exercise personal 
jurisdiction over the defendant even if the cause of action did not arise from 
or relate to activities conducted within the forum state. Helicopteros, 466 
U.S. at 414 n.9, 104 S. Ct. at n.9; BMC, 83 S.W.3d at 796; Schlobohm, 
784 S.W.2d at 357. When general jurisdiction is asserted, the minimum contacts 
analysis is more demanding than when specific jurisdiction is asserted and 
requires a showing of substantial activities in the forum state. Guardian, 
815 S.W.2d at 228; Schlobohm, 784 S.W.2d at 357.
Analysis
        HMS’s 
alleged liability to Layale does not arise from and is not related to an 
activity that HMS conducted in Texas. Therefore, we are not concerned with 
specific jurisdiction. Layale asserts general jurisdiction was shown in this 
case due to HMS’s continuous and systematic contacts with Texas. The plaintiff 
bears the initial burden of pleading sufficient allegations to bring a 
nonresident defendant within the provisions of the long-arm statute. Coleman, 
83 S.W.3d at 807; McKanna v. Edgar, 388 S.W.2d 927, 930 (Tex. 1965). But 
upon filing a special appearance, the nonresident defendant assumes the burden 
to negate all the bases of personal jurisdiction alleged by the plaintiff. Coleman, 
83 S.W.3d at 807; Kawasaki Steel Corp. v. Middleton, 699 S.W.2d 199, 203 
(Tex. 1985). General jurisdiction is premised on the notion of consent. Coleman, 
83 S.W.3d at 808. That is, by invoking the benefits and protections of a 
forum’s laws, a nonresident defendant consents to being sued there. Id. 
When a nonresident defendant purposefully structures transactions to avoid the 
benefits and protections of a forum’s laws, the legal fiction of consent no 
longer applies. Id. For general jurisdictional purposes, we do not view 
each contact in isolation. Id. at 809. All contacts must be carefully 
investigated, compiled, sorted, and analyzed for proof of a pattern of 
continuing and systematic activity. Id.; Schlobohm, 784 S.W.2d at 
359.
        Because 
Layale alleges that general jurisdiction exists, we examine whether HMS met its 
burden of establishing that its contacts with Texas were not continuous and 
systematic. HMS is a sole proprietorship unincorporated business operating under 
the laws of Jordan with offices in London, England and Amman, Jordan. The owner, 
Hany Mohammed Salaam, is a citizen of Lebanon and resides in London and Beirut, 
Lebanon. Salaam has never lived in, maintained a residence in, or been a citizen 
of Texas. By affidavit, Salaam testified that neither HMS nor Salaam 
individually has ever done business in Texas, had any business office or owned 
any real or personal property in Texas, had any bank accounts in Texas, had any 
telephone listings or mailing addresses in Texas, been issued a certificate of 
authority to conduct affairs in Texas, or had a registered agent for service of 
process in Texas.
        Salaam 
designated Salem Bayazid to be President of HMS; Bayazid is a citizen of Egypt 
and resides in Paris, France. In March 1996, Bayazid accompanied one of HMS’s 
airplanes (HS-1, which is not the Airplane in dispute in this lawsuit) to San 
Antonio, Texas for installation of avionic devices on HS-1. The service provider 
was S.I.P. Technical Services, Inc. (S.I.P.). The original contract between HMS 
and S.I.P. was signed by Bayazid in Beirut, and Bayazid signed additional 
contracts when he arrived in San Antonio. It is a customary requirement in the 
industry that at least one representative must accompany an airplane when it is 
being refurbished. Bayazid was in San Antonio for approximately fifteen to 
twenty days while the work was being performed.
        Bayazid 
returned to Texas in 1996 from mid-May to mid-June when he accompanied the 
Airplane in dispute in this lawsuit to San Antonio to have work performed by 
S.I.P. Bayazid testified that he did not recall if he signed this new contract 
with S.I.P. while he was in Beruit or San Antonio. He remained in San Antonio 
with the Airplane for fifteen to twenty days. During each of his visits to San 
Antonio, Bayazid stayed in a hotel and sat in the S.I.P. conference room; he did 
not have an office in San Antonio and did not at any time attempt to sell any 
services or goods in Texas. Bayazid acknowledged on cross-examination that there 
was an economic benefit to HMS to bringing HS-1 and the Airplane to San Antonio 
because this procedure cost much less than flying S.I.P.’s entire crew outside 
the country to perform the work wherever the airplanes were currently located.
        In 
December 1996, Bayazid brought the Airplane to Meacham Field in Fort Worth, 
Texas, so that International Aviation Services, Ltd. (IAS) could perform repair 
and refurbishing work on the Airplane. Several people accompanied Bayazid on the 
Airplane. Two flight attendants cleaned the airplane and stayed approximately 
two days, and the pilot and co-pilot stayed a week to discuss the repairs with 
IAS. While Bayazid was in Fort Worth waiting for the repairs to be completed on 
the Airplane, he stayed at a hotel and occupied whatever space IAS offered to 
him. This space included a telephone to which he had access, and IAS provided 
Bayazid with a cell phone for his use during his stay. IAS moved Bayazid from 
one space to another when they needed the room.[7]  
Bayazid testified he never paid for the use of any office space at IAS’s 
facility or for the use of the office telephone or the cell phone, and the 
contract price for the work did not include charges for office space or 
telephone usage.
        The 
repair contract with IAS was signed by Bayazid, as President of HMS, on December 
6, 1996 and states it is entered into between IAS and HRH Prince Talal Bin 
Mohammed. The Airplane was initially brought to Fort Worth so that IAS could 
install an auxiliary fuel tank system, and the scope of the work expanded to 
include a complete paint job on the Airplane and interior upgrades and 
modifications. On March 19, 1997, HMS and IAS entered into another repair 
contract for the Airplane; Bayazid signed the contract on behalf of HMS. Both of 
the contracts with IAS were signed by Bayazid in Fort Worth.
        Both 
the December 6, 1996 contract and the March 19, 1997 contract specify that any 
claim or controversy arising out of the contracts shall be submitted to 
arbitration to be conducted in Tarrant County, Texas, that the applicable 
substantive law governing the arbitration and the interpretation of the 
contracts shall be done under the law of the State of Texas, and that 
“judgment upon the award rendered by the arbitrators may be entered in any 
court having jurisdiction thereof.”[8]
        IAS’s 
President, Walter Nubel, testified by deposition that when IAS is working on an 
airplane, the company’s policy is that a representative of the customer must 
be easily available to review, discuss, and approve the work. It is customary in 
the industry to require a representative to be present and to provide an office 
for this purpose. As part of the bidding process, the charge for this office and 
the cost of lights and phones, along with labor costs, is the facility’s 
overhead that is built into the price of the bid.
        Layale 
has alleged that it is the true owner of the Airplane and that HMS converted the 
Airplane, last seen by Layale in Amman, Jordan. Therefore, Layale’s cause of 
action does not arise from any activities of HMS that occurred with any person 
or entity located in Texas. Accordingly, we must determine if HMS’s contacts 
with Texas were so continuous and systematic that Texas may exercise personal 
jurisdiction over HMS even if the cause of action did not arise from or relate 
to activities conducted within Texas.
        Although 
HMS brought two of its airplanes to Texas for repairs and refurbishing on three 
occasions, neither HMS, its owner, or its President ever maintained a residence 
or office of any sort in Texas, nor did they own any property within Texas. HMS 
established that it is customary in the aviation repair business to require a 
representative of the owner to be present onsite to resolve any problems that 
arise during the repair process. During these trips to Texas, HMS personnel did 
not transact any business in Texas; their presence was required by the vendors 
and the only business they transacted related to the repair and refurbishing of 
HS-1 or the Airplane.
        Mere 
purchases from the forum state, standing alone, even if occurring at regular 
intervals, are not enough to warrant a state’s assertion of in personam 
jurisdiction over a nonresident in a cause of action not related to those 
purchases. Helicopteros, 466 U.S. at 417-18, 104 S. Ct. at 1874; see 
Garner v. Furmanite Australia Pty., Ltd., 966 S.W.2d 798, 803 (Tex. 
App.—Houston [1st Dist.] 1998, pet. denied). Additionally, even when purchases 
in the forum state are combined with the nonresident sending personnel into the 
forum state for training purposes, this is insufficient to establish in personam 
jurisdiction. See Helicopteros, 466 U.S. at 418, 104 S. Ct. at 
1874.
        Layale 
argues that in personam jurisdiction has attached because HMS invoked the 
benefits and protections of the laws of the State of Texas in the contracts that 
HMS signed with S.I.P. and IAS. Layale contends that HMS should have reasonably 
anticipated being called into a Texas court because it signed contracts with 
these two Texas vendors, and two of the contracts contain forum-selection 
clauses. The initial contract with S.I.P. was signed by Bayazid in Beruit, and 
the additional contracts were signed by him either in Beruit or in San Antonio, 
when he was accompanying the plane to the vendor’s place of business. The two 
contracts with IAS were signed in Texas and provide that they shall be 
interpreted under the laws of the State of Texas, and any arbitration shall be 
conducted in Tarrant County, Texas.
        Foreseeability 
alone has never been a sufficient benchmark for personal jurisdiction under the 
Due Process Clause. World-Wide, 444 U.S. at 295, 100 S. Ct. at 566. The 
foreseeability that is critical to a due process analysis is not the mere 
likelihood that a product will find its way into the forum state. See id. 
at 297, 100 S. Ct. at 567. Rather, it is that the defendant's conduct and 
connection with the forum state are such that the defendant should reasonably 
anticipate being haled into court there. Id.; see Kulko v. Superior 
Court of California, 436 U.S. 84, 97-98, 98 S. Ct. 1690, 1699-1700 (1978).
        The 
forum-selection clauses for purposes of arbitration were in the contracts that 
HMS entered into with parties that are not involved in this suit. While HMS 
should have reasonably anticipated that it could be called into a Texas court to 
respond to a lawsuit involving these two contracts with third parties, these 
contracts are totally unrelated to the causes of action alleged by Layale in the 
instant lawsuit and do not affect in any way the allegations made by Layale 
against HMS. We find the case of Project Engineering USA Corp. v. Gator Hawk, 
Inc., relied upon by Layale, to be distinguishable on its facts. 833 S.W.2d 
716 (Tex. App.—Houston [1st Dist.] 1992, no writ). Gator Hawk sued a 
nonresident California defendant in Texas. Id. at 719. The evidence at 
the special appearance hearing established that the nonresident defendant served 
as a distributor in California for three separate Texas companies, none of whom 
were parties to the underlying lawsuit. The contract with one of these Texas 
companies contained a forum-selection clause providing Texas as the proper forum 
for any litigation between those parties. Id. at 720. In considering all 
the evidence from the hearing, the appellate court held that the nonresident 
defendant had minimum contacts in Texas because it could reasonably be inferred 
that in furtherance of its representation efforts in California for the three 
Texas companies, the nonresident defendant “necessarily had to keep in regular 
communication with the Texas companies it represented.” Id. at 722. We 
find these facts establish noticeably stronger ties to Texas than those 
presented to the trial court in the instant case, which did not involve any 
continued employment contracts agreed to by HMS to do business in Texas. Rather, 
HMS entered into several repair and refurbishing contracts, two of which had a 
forum-selection clause for purposes of arbitration, but unlike the nonresident 
defendant in Gator Hawk, HMS never agreed to act as a distributor or 
employee of a Texas company.
        Upon 
review of all the evidence presented to the trial court, we conclude that 
HMS’s contacts with the State of Texas were not so continuous and systematic 
as to invoke in personam jurisdiction over HMS. We hold that HMS met its burden 
of establishing that in personam jurisdiction was not proven because HMS did not 
have sufficient minimum contacts with the State of Texas. Accordingly, when the 
trial court ruled upon HMS’s special appearance, the court did not err in 
determining that it lacked in personam jurisdiction over HMS.
In Rem 
Jurisdiction
        HMS 
challenges the trial court’s ruling that it had in rem jurisdiction over the 
Airplane. A judgment in rem affects the interests of all persons in designated 
property. Shaffer, 433 U.S. at 199 n.17, 97 S. Ct. at 2577 n.17. A 
judgment quasi in rem affects the interests of particular persons in designated 
property. Id. A judgment quasi in rem can be of two types: in Type One, 
the plaintiff is seeking to secure a pre-existing claim in the subject property 
and to extinguish or establish the nonexistence of similar interests of 
particular persons; in Type Two, the plaintiff seeks to apply what he concedes 
to be the property of the defendant to the satisfaction of a claim against him. Id. 
The instant case involves Type One quasi in rem jurisdiction inasmuch as Layale 
sought to secure a pre-existing claim in the Airplane and to extinguish or 
establish the nonexistence of similar interests of HMS. See id.
        In 
Pennoyer v. Neff, the United States Supreme Court held that a state court 
could exercise jurisdiction over property within the state’s borders and 
determine the rights and interests of nonresidents. 95 U.S. 714 (1877) 
(available at 1877 WL 18188). But in Shaffer, the court abandoned this 
position and concluded instead that jurisdiction over property, like 
jurisdiction over persons, must be based on minimum, purposeful contacts and 
must not offend traditional notions of fair play and substantial justice. 433 
U.S. at 212, 97 S. Ct. at 2584; see Dawson-Austin, 968 S.W.2d at 327. 
After extensively reviewing the history of the requirements for in rem 
jurisdiction, the Shaffer court concluded that:
  
The 
fiction that an assertion of jurisdiction over property is anything but an 
assertion of jurisdiction over the owner of the property supports an ancient 
form without substantial modern justification. Its continued acceptance would 
serve only to allow state-court jurisdiction that is fundamentally unfair to the 
defendant.
 
We 
therefore conclude that all assertions of state-court jurisdiction must be 
evaluated according to the standards set forth in International Shoe and its 
progeny.
 
 
433 
U.S. at 212, 97 S. Ct. at 2584; Int’l Shoe, 326 U.S. 310, 66 S. Ct. 
154. The Court subsequently interpreted Shaffer as determining that:
  
quasi 
in rem jurisdiction, that fictional “ancient form,” and in personam 
jurisdiction, are really one and the same and must be treated alike -- leading 
to the conclusion that quasi in rem jurisdiction, i.e., that form 
of in personam jurisdiction based upon a “property ownership” contact 
and by definition unaccompanied by personal, in-state service, must satisfy the 
litigation-relatedness requirement of International Shoe.
  
   
Burnham 
v. Superior Court of California, 495 U.S. 604, 621, 110 S. Ct. 2105, 2116 
(1990).
        International 
Shoe holds that the defendant's contacts with the forum state must be such 
that maintenance of the suit "does not offend traditional notions of fair 
play and substantial justice.” World-Wide, 444 U.S. at 292, 100 S. Ct. 
at 564; Int’l Shoe Co., 326 U.S. at 316, 66 S. Ct. at 158. The 
relationship between the defendant and the forum must be such that it is 
reasonable “to require the defendant to defend the particular suit which is 
brought there.” World-Wide, 444 U.S. at 292, 100 S. Ct. at 564; Int’l 
Shoe Co., 326 U.S. at 316-17, 66 S. Ct. at 158. Implicit in this emphasis on 
reasonableness is the understanding that the burden on the defendant, while 
always a primary concern, will in an appropriate case be considered in light of 
other relevant factors. World-Wide, 444 U.S. at 292, 100 S. Ct. at 564. 
Other factors to consider in determining whether jurisdiction in the forum state 
comports with traditional notions of fair play and substantial justice include 
the the interests of the forum state in adjudicating the dispute, the 
plaintiff’s interest in obtaining convenient and effective relief, the 
interstate judicial system’s interest in obtaining the most efficient 
resolution of controversies, and the shared interest of the several states in 
furthering fundamental substantive social policies. Asahi, 480 U.S. at 
113, 107 S. Ct. at 1033; Guardian, 815 S.W.2d at 229.
        “The 
unique burdens placed upon one who must defend oneself in a foreign legal system 
should have significant weight in assessing the reasonableness of stretching the 
long arm of personal jurisdiction over national borders.” Asahi, 480 
U.S. at 114, 107 S. Ct. at 1033. The Supreme Court in Asahi further 
elaborated upon what must be considered in determining whether assertion of 
jurisdiction by a forum state would offend traditional notions of fair play and 
substantial justice:
  
The 
procedural and substantive interests of other nations in a state court’s 
assertion of jurisdiction over an alien defendant will differ from case to case. 
In every case, however, those interests, as well as the Federal interest in 
Government’s foreign relations policies, will be best served by a careful 
inquiry into the reasonableness of the assertion of jurisdiction in the 
particular case, and an unwillingness to find the serious burdens on an alien 
defendant outweighed by minimal interests on the part of the plaintiff or the 
forum State. “Great care and reserve should be exercised when extending our 
notions of personal jurisdiction into the international field.”

Id  
. at 115, 107 S. Ct. at 1034 (citations omitted).
Analysis
        Considering 
all the evidence presented to the trial court, we must determine whether HMS met 
its burden of establishing that assertion of in rem jurisdiction over the 
Airplane would offend traditional notions of fair play and substantial justice. See 
Coleman, 83 S.W.3d at 806-07; Kawasaki Steel, 699 S.W.2d at 203. 
The dispute in this case arises out of an alleged conversion of the Airplane 
that took place in Amman, Jordan. There is no indication the Airplane was built 
in Texas or that any events between HMS and Layale transpired in Texas. Layale 
is a Panamanian corporation which has stated that it registered the Airplane in 
the Cayman Islands, British West Indies. HMS is a business operating under the 
laws of Jordan with offices in London, England and Amman, Jordan. HMS’s owner 
is a citizen of Lebanon and resides in London and Beruit. HMS’s President is a 
citizen of Egypt and resides in Paris, France. The Sultan of Brunei, through 
whom Layale contends it purchased the Airplane, lives in Brunei. HMS claims 
legal possession of the Airplane through a lease agreement with a Prince and 
Princess of the Hashemite Kingdom of Jordan.[9]  
Therefore, it is apparent that all except one of the potential witnesses 
regarding the issue of possession, ownership, and conversion of the Airplane 
reside outside Texas, and most reside outside the United States.[10] No one who asserts ownership or possession, or any of 
their witnesses except one, resides in Texas or has any minimum contacts in 
Texas.
        Quite 
understandably, when Layale became aware in 1996 that the Airplane had been 
located in Fort Worth, Layale took whatever legal measures it deemed appropriate 
under Texas law to sequester the Airplane. However, there is nothing in the 
record to indicate that HMS and Layale had any dealings with each other in Texas 
prior to Layale initiating this lawsuit. None of the events leading up to the 
parties disputing ownership or possession of the Airplane occurred in Texas or 
even in the United States. None of the parties or their witnesses lived in 
Texas. None of the documents alleged by the parties to support their respective 
positions of ownership or right of possession to the Airplane were signed or 
negotiated in Texas. It was merely fortuitous that Layale discovered the 
Airplane temporarily located at Meacham Field in Fort Worth while the Airplane 
was being repaired and refurbished.
        Due 
to this almost complete lack of significant contacts with the State of Texas, we 
conclude that the interest of the State of Texas in litigating this dispute 
which seeks an adjudication of possession or title to the Airplane, when coupled 
with the burden upon HMS in having to defend its claim of possession to the 
Airplane in Texas, was unreasonable and offends traditional notions of fair play 
and substantial justice. Therefore, we hold the trial court lacked in rem 
jurisdiction in this case.
Conclusion
        Because 
we conclude the trial court lacked in rem jurisdiction, we hold the court erred 
in denying the special appearance of HMS. Accordingly, we reverse the judgment 
of the trial court and render judgment dismissing the case for lack of trial 
court jurisdiction.
 
  
                                                                  DIXON 
W. HOLMAN
                                                                  JUSTICE
  
   
PANEL 
B:   LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.
 
DELIVERED: 
August 25, 2004


NOTES
1.  
If a court’s jurisdiction is based on its authority over the defendant’s 
person, the action and judgment are denominated “in personam” and can impose 
a personal obligation on the defendant in favor of the plaintiff. Shaffer v. 
Heitner, 433 U.S. 186, 199, 97 S. Ct. 2569, 2577 (1977). If jurisdiction is 
based on the court’s power over property within its territory, the action is 
called “in rem” or “quasi in rem.” Id. The effect of a judgment 
in an in rem or quasi in rem case is limited to the property that supports 
jurisdiction and does not impose a personal liability on the property owner. Id.
2.  
HMS states the Airplane is a Boeing 727-2LR whereas Layale states the Airplane 
is a Boeing 727-200-2L4. Both parties agree the manufacturer’s serial number 
is 21010.
3.  
Attached to HMS’s February 17, 2004 motion to reinstate this appeal is an 
order from the trial court dated January 28, 2004, entitled “Order Requesting 
Expedited Jurisdictional Rulings From Court Of Appeals And Staying The Trial Of 
This Case.” The order stays the trial of this case until the jurisdictional 
issues pending in this appeal are determined and requests that this court rule 
on the jurisdictional issues as quickly as possible because a resolution of 
those issues is likely to determine the outcome of the case. We certainly 
appreciate the trial court’s concern and simply note that during the more than 
five years that this appeal was abated, this court received nothing in this case 
from any source notifying us that the federal court had remanded this case to 
the state court in February 1999.
4.  
Tex. R. Civ. P. 120a, 25 Tex. B.J. 372 (1962) (added by order of 
April 12, 1962, effective Sept. 1, 1962).
5.  
At the conclusion of the hearing on HMS’s special appearance, the trial judge 
stated his ruling and then informed the parties that he would withhold any 
hearings on HMS’s motion to increase the sequestration bond until the parties 
“have an opportunity to present this ruling to the Court of Appeals.”
6.  
On April 21, 2004, Layale filed a motion in this court requesting we dismiss 
HMS’s appeal, alleging three actions of HMS that Layale contended constituted 
a general appearance in the trial court and warranted dismissal of HMS’s 
appeal. On May 13, 2004, this court denied Layale’s motion to dismiss HMS’s 
appeal. One of the actions stated in Layale’s motion was HMS’s filing of its 
motion to increase the sequestration bond, which we have addressed in this 
opinion. The other two actions alleged by Layale in support of its motion to 
dismiss HMS’s appeal were not mentioned, raised, or argued in Layale’s 
appellate brief; therefore, we do not address them in this opinion.
7.  
Bayazid testified that he was not entitled to any particular spot at the IAS 
facility, and “[a]s a matter of fact, they threw me out of the place that I 
was occupying because they needed -- they had another airplane coming in with 
several representatives and they needed the space and they asked me -- They 
didn’t ask me, they told me that ‘we’re moving you,’ so they moved me 
and they put my things in a box and now wherever I go there, I sit at the -- in 
the conference room or at the secretary’s desk or whatever. I don’t have a 
space.”
8.  
Page 12 of the December 5, 1996 contract is missing from Layale’s Exhibit 11 
in the appellate record; the missing page appears to contain the text of all of 
section XIII and portions of section XII and XIV.
9.  
We need not determine which country’s law applies to the causes of action 
alleged because that issue is not before us, and neither party has asserted that 
Texas law applies.
10. 
In response to an interrogatory asking HMS to identify officers, employees, or 
representatives of HMS who have had any contact with Texas, HMS listed twelve 
individuals who live in England, one who lives in the United Kingdom, four who 
live in France, one who lives in Florida, and one who lives in Dallas, Texas. 
HMS subsequently explained that although it had listed a Dallas address for 
Robert Tunnell, a former flight engineer, Tunnell resided in Amman, Jordan when 
he was employed by HMS.